NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ANCORA PSYCHIATRIC HOSPITAL, et al.,

    Plaintiffs,

v.

Michael O. LEAVITT, Secretary of the U.S. Department of Health and Human Services, and Kerry Weems, Acting Administrator of the Centers for Medicare & Medicaid Services,

    Defendants.

Civ. No. 09-0009

OPINION

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court upon Plaintiffs' Motion for Summary Judgment [docket # 15] and Defendants' Cross Motion for Summary Judgment [17]. The Court has decided the motions based upon the parties' written submissions and without oral argument. For the reasons given below, Plaintiffs' motion is DENIED and Defendants' motion is GRANTED.

## BACKGROUND

Plaintiffs are all psychiatric hospitals operated by the New Jersey Department of Human Services, Division of Mental Health Services that provide services to Medicare beneficiaries. Each year, they submit cost reports which are used as a basis for calculating reimbursement by the federal government. From 1982 through 2005, these reimbursements were limited by the Tax Equity and Fiscal Responsibility Act ("TEFRA"). TEFRA limits each hospital's reimbursements to a "target amount." In the first year a hospital reports its costs, the "target amount" equals the total of its "allowable operating costs of inpatient hospital services." 42

U.S.C. § 1395ww(b)(3)(A). In every subsequent year, a hospital's "target amount" equals the target amount for the preceding year multiplied by an inflation factor. *Id.* This relatively simple equation was complicated when Congress passed the Balanced Budget Act of 1997 ("BBA"). That Act added a new section to TEFRA, which provides that for each "cost reporting period beginning during fiscal years 1998 through 2002, the target amount for [] a hospital or unit may not exceed . . . the 75th percentile of the target amounts for such hospitals" of a similar class. 42 U.S.C. § 1395ww(b)(3)(H). This 75th percentile cap was determined based on 1996 target amounts and then indexed for inflation for the subsequent years the cap remained in effect. *Id.*

In 1999 Congress passed the Balanced Budget Refinement Act, which created a wholly new system for reimbursing hospitals that participate in Medicare—the Prospective Payment System. This system was supposed to take effect in 2002, just as the BBA caps on the TEFRA system expired. However, the Centers for Medicare and Medicaid Services ("CMS")—the federal agency responsible for administering Medicare—did not fully implement the new system until fiscal year 2008. As a result, TEFRA remained in effect for several years beyond the expiration of the BBA caps.

This lawsuit concerns the effect of the lapse of the BBA caps on Plaintiffs' reimbursement payments. The dispute in this case amounts to a disagreement over how each hospital's "target amount" should be calculated for the fiscal years ending (FYE) in 2004, 2005, and 2007. The critical year in this dispute is FYE 2004, the first year in which the BBA caps did not apply. It is undisputed that, for subsequent years, the target amount for each hospital should be calculated by taking the prior year's target amount and applying an inflation multiplier. In FYE 2004 CMS calculated each hospital's target amount by taking the FYE 2003 target amount, *which had been subject to the BBA caps*, and applying the applicable inflation multiplier.

Plaintiffs contend that the target amounts should have been calculated by taking the target amount from each hospital for FYE 1998—the most recent prior year in which the caps had not been in effect—and then adjusting that amount by the relevant inflation multiplier through each successive year to arrive at the figure that would have applied in 2004 *had the BBA caps never been in effect*. Since these amounts represent what each hospital's target amount would have been had the 75th percentile cap never been applied to limit each hospital's individually-calculated target amount, they are referred to as the "hospital specific target amounts."

Each plaintiff ultimately received a Notice of Program Reimbursement that reflected CMS's calculations of its target amount, not its "hospital specific" target amount. Plaintiffs appealed these notices to the Provider Reimbursement Review Board, which affirmed the CMS-calculated reimbursement rates. The board also certified the dispute for expedited judicial review. This action followed.

## ANALYSIS

I. Standard of Review

   A. Summary Judgment

A case may be resolved on summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). If a motion for summary judgment is supported by facts on the record, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The parties in this case agree that the question

presented is primarily one of law and that all the relevant facts are contained in the administrative record. Therefore, summary judgment is appropriate in this case.

  B. <u>Review of Administrative Action</u>

  Under the Administrative Procedure Act, federal courts are authorized to set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under this standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency decision may warrant reversal, however, if the agency committed an error like relying on factors not contemplated by the relevant statute, failing to consider an aspect of the problem at issue, offering an explanation that runs counter to the available evidence, or giving an explanation so implausible that it cannot be ascribed to mere difference of opinion. *Id.* Of course, if an agency action is clearly contrary to statutory law, it must be set aside.

  When reviewing an agency's interpretation of a statute, a court undertakes a two-step analysis. First, the court determines "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The level of deference a court should show to an agency in appraising the agency's interpretation varies depending on the agency's role in implementing the statute at issue. At one end of the spectrum,

> [w]hen Congress has explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation, and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.

*United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (citations omitted). On the other hand, if the interpretation in question does not involve an area of law in which Congress explicitly or impliedly delegated lawmaking authority to the administrative agency, a lesser degree of deference may be accorded, based on the fact that "the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Id.* (quoting *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998)).

II. Clear Statutory Language

Upon review of the statute at issue in this case, this Court concludes that the statutory language is clear and that CMS's interpretation of the statute is compelled by law.[1]

Plaintiffs' argument is that by determining their FYE 2004 target amounts by taking the FYE 2003 target amounts—as subject to the BBA caps—and then applying the inflationary multiplier, CMS "contravened the clear expression of Congressional intent." (Mem. Law Supp. Pls.' Mot. Summ. J. 9.) CMS's decision supposedly "has led to the perpetual imposition of the Cap beyond the period imposed by Congress." (*Id.* at 11.) The Court does not find these arguments persuasive. It is true that the statute clearly states that, beginning in FYE 2004, the target amount for each hospital facility is no longer subject to capping under the BBA-imposed rules. However, the procedure adopted by CMS satisfies that requirement. For FYE 2004 through 2007, each hospital's target amount was calculated simply by taking the previous year's

---

[1] The Court arrives at this conclusion for the same general reasons that the U.S. District Court for the Eastern District of Louisiana did when it considered the very same question presented in this case. *Chalmette Med. Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, Civ. No. 08-4027, 2009 WL 2488265, *5 (E.D. La. Aug. 11, 2009).

target amount and applying the relevant inflationary multiplier.  In those years, hospitals no longer had to abide by the additional BBA-imposed procedures outlined in 42 U.S.C. § 1395ww(b)(3)(H) and implemented at 42 C.F.R. § 413.40(c)(4)(iii).  Plaintiffs correctly point out that, under CMS's procedure, the BBA caps continued to have a lingering effect beyond their "expiration" at the end of FYE 2003.  That is, since the BBA placed a cap on target amounts in FYE 2003, any target amount derived from the FYE 2003 numbers would bear a causal relationship to the BBA caps.  However, Plaintiffs have not pointed to any statutory language or legislative materials that suggest that these lingering effects were expressly disapproved by Congress.  Indeed, Congress deliberately implemented a statutory structure where each hospital's target amount had to be calculated by making reference to the prior year's target amount.  42 U.S.C. § 1395ww(b)(3)(A)(ii).  Given a statutory structure where target amounts are supposed to grow by a specific inflationary percentage each year, it is neither surprising nor obviously contrary to Congressional intent that a limitation imposed in one year would have a kind of "echo" effect in subsequent years.

In any event, the best indication of Congressional intent is the language of the statute, and in this case, the plain language of the statute commands the result that CMS reached.  42 U.S.C. § 1395ww(b)(3)(A)(ii) specifically states that "the term 'target amount' means, with respect to a hospital for a particular 12-month cost reporting period--

> (i) in the case of the first such reporting period for which this subsection is in effect, the allowable operating costs of inpatient hospital services (as defined in subsection (a)(4) of this section) recognized under this subchapter for such hospital for the preceding 12-month cost reporting period, and
>
> (ii) *in the case of a later reporting period, the target amount for the preceding 12-month cost reporting period*,
>
> *increased by the applicable percentage increase* under subparagraph (B) for that particular cost reporting period.  (emphasis added).

6

In other words, the target amount for FYE 2004 for each Plaintiff was, as a matter of statutory law, equal to the target amount for FYE 2003 as increased by the relevant inflationary multiplier. With regards to what counts as the "target amount" for FYE 2003 (as well as FYE 1999-2002), the statute further provides that "for a cost reporting period beginning during fiscal years 1998 through 2002, the target amount for such a hospital or unit may not exceed . . . the 75th percentile of the target amounts for such hospitals within [a similar] class." 42 U.S.C. § 1395ww(b)(3)(H)(ii) & (ii). Applied to this case, this language effectively sets each hospital's target amount at a number no greater than target amounts in the 75th percentile for similar hospitals. Since Plaintiffs' hospital-specific amounts would have exceeded this percentile-determined cap, Plaintiffs' FYE 2003 target amount simply *was* the BBA-capped amount. Therefore, the capped amount was the appropriate figure for CMS to use when calculating Plaintiffs' target amounts for FYE 2004. *Accord Chalmette Med. Ctr.*, 2009 WL 2488265 at *5.

Since the regulations promulgated by CMS comport with 42 U.S.C. § 1395ww(b)'s clear language, Defendants did not act arbitrarily, capriciously, or contrary to law. Summary judgment in Defendants' favor is appropriate.

### III. Deference to CMS's Interpretation

Even if this Court were to find that the statute is susceptible to more than one reasonable interpretation, summary judgment should be awarded to Defendants because CMS's interpretation of the statute is reasonable and the product of rulemaking authority. *Mead*, 533 U.S. at 227. Assuming for the moment that the meaning of the term "target amount" is unclear because of the interplay between subsections (b)(3)(A) & (b)(3)(H) of 42 U.S.C. § 1395ww, CMS's regulations at 42 C.F.R. § 413.40(c)(4) are a reasonable resolution of this ambiguity. Those regulations provide in relevant part that:

> (ii) Subject to the provisions of paragraph (c)(4)(iii) of this section, for [] cost reporting periods [beyond the first year], the target amount equals the hospital's target amount for the previous cost reporting period increased by the update factor for the subject cost reporting period. . . .
>
> (iii) For cost reporting periods beginning on or after October 1, 1997 through September 30, 2002, in the case of a psychiatric hospital or unit, rehabilitation hospital or unit, or long-term care hospital, *the target amount is the lower of the amounts specified in paragraph (c)(4)(iii)(A)* [referring to the hospital specific target amounts] *or paragraph (c)(4)(iii)(B) of this section* [referring to the BBA cap level]. (emphasis added).

By stating that the target amount simply "is" the lower of the hospital specific target amount or the BBA cap level, subsection (c)(4)(iii) defines the target amount for FYE 2003 as the capped amount for hospitals like Plaintiffs, whose hospital specific amount was greater than the cap. In FYE 2004, subsection (c)(4)(iii) is inapplicable. Subsection (c)(4)(ii) therefore applies for FYE 2004 and defines the target amount as the hospital's target amount from FYE 2003, updated by the relevant inflationary measure. In sum, CMS's regulations interpret "target amount" to mean the amount used for the prior year's reimbursement calculations increased by the relevant inflation multiplier, whether or not the prior year's amount was the product of the BBA caps.

   This is a reasonable interpretation. The statutory provision at issue—42 U.S.C. § 1395ww(b)(3)—neither implies nor expressly states that the BBA cap is used "in lieu" of the target amount, or that it "supersedes" the target amount. At best, the statute is unclear as to whether the BBA cap is intended *to modify* the definition of the term "target amount" or *to be used in lieu of* the target amount. CMS's regulations are only contrary to law if the second of these two possibilities is the case. Given this ambiguity and the absence of any statutory or legislative materials demonstrating that Congress intended the second of these two interpretations, CMS was reasonable to explicitly incorporate the BBA cap into the meaning of "target amount" through 42 C.F.R. § 413.40(c)(4).

Plaintiffs attempt to create further ambiguity by citing to two portions of the Federal Register which they believe show that, in the past, CMS believed that "target amount" meant the hospital-specific target amount. *See* 63 Fed. Reg. 26318, 26345-47; 67 Fed. Reg. 49982, 50133. Plaintiffs do not bother to explain what these portions of the federal register are or why they are significant to the statutes and regulations at issue in this case. But it is quite clear from even a brief examination that these passages simply explain the basic statutory structure that the Court has already discussed. They tend to support the same point that has been made above: The phrase "target amount" for FYE 2004 is best understood to mean the target amount from FYE 2003 as capped by BBA and then updated by the relevant inflationary measure.

Since CMS's interpretation of 42 U.S.C. § 1395ww(b)(3) is a reasonable exercise of rulemaking authority, the Court will give it the appropriate deference. This constitutes an alternative ground on which to award summary judgment to Defendants.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [15] will be DENIED, and Defendants' Cross-Motion for Summary Judgment [17] will be GRANTED. An appropriate order will follow.

|  |  |
|---|---|
| *March 8, 2010* | */s/ Anne E. Thompson* |
| DATE | ANNE E. THOMPSON, U.S.D.J. |

9